Bissell, J.,
delivered the opinion of the court.
No legal question of any considerable difficulty is presented by this record. The facts are not at all complicated, and the conclusions of the trial court accorded with the defendant’s contentions, and from the judgment entered thereon the H. J. Heinz Company prosecute error.
We find no difficulty in affirming the judgment if we accept the court’s estimate of the evidence, because we are quite able to find in the record sufficient testimony to support it. It is an almost universal rule to affirm judgments which rest on matters of fact where there is evidence supporting the judgment. The plaintiffs in error recognize this rule and attempt to take the case out of its operation by an argument to the point that there is no testimony by which the judgment can be sustained. We cannot agree with their conclusions *32 in respect to this matter. The H. J. Heinz Company were engaged in the business of growers, packers and dealers in pickles, preserves, sauces and other condiments, and had an office in Pittsburg, Pa. In the conduct of their general business they established agencies or branch offices in different sections of the country. One of them was established in Denver. When the Denver branch was started, Johnson was put in charge in February, 1889, and he continued to control the agency until the fall of 1890, when he was succeeded by Heiser, who was succeeded by Schmidtt. When the agency was first established, the accounts of the firm were kept in the individual name of the manager, Johnson, who sold the goods, collected the money therefor, and deposited it in his own name, checking on the account as though it was an individual proposition. It continued in this way until the month of April, 1890, when the Heinz Company advised the American National Bank, where the account had been kept, that from that time forward the account should be transferred to and carried under the firm name and subject only to the firm’s check. Antecedent to. that time, as a matter of course, Johnson had indorsed and collected all checks which he had received in the usual course of business, and he had been fully authorized by the firm to make these indorsements, and under the letter of April 24th, which directed the account transferred to the firm name, it was directly stated to the bank that Johnson was authorized to indorse all paper payable to the firm and to deposit it to the credit of the account. There was no limitation in that special direction which limited Johnson’s power to indorse the paper for the purposes of collection. There is an undated letter found in the deposition of Prager, who was a member of the firm, which simply contained a general authority to Johnson to indorse all checks payable to the agency for deposit only in the bank to the credit of the firm. Prager gave evidence tending to show that this letter was mailed with the other to the bank, but the cashier, who was produced by the plaintiffs, testified that that particular letter *33 was never received. We do not deem this of very much consequence, because we find in neither of the letters any limitation on the general authority which the manager had theretofore possessed to indorse all checks and drafts which the agency might receive in the transaction of the business. Nor do we find in either letter any limitation on the authority of the manager to indorse and collect whatever drafts or checks he might receive, devoting the proceeds to the purposes of the business and the agency, without depositing them to the credit of the firm, when the funds would only be available on the firm’s check. We are not able to discover from these two letters any terms of limitation which will give any notice to the bank that the authority which the general manager had possessed was to be thereafter at all restricted in its exercise, except as it would be controlled by the circumstance that some of the funds might go into the firm account and be deposited to the firm’s credit in the bank. It is of course conceded that when once the monejns had reached the firm account in the bank they were no longer subject to Johnson’s check, and were only available on paper to which was attached the.firm’s signature. This limitation, of course, continued from April to the time of the events which form the substance of the controversy. Johnson ultimately severed his connection with the firm, was succeeded by Heiser, who was followed by Sehmidtt. The business of the agency was conducted after Johnson’s relations were ended as before. During all this time the Denver branch sold large quantities of goods, collected the pay therefor either by checks or in money, indorsed and collected checks without putting them to the firm’s credit, and used the proceeds in the liquidation of the general current expenses of the agency. This was undoubtedly known to the Pittsburg house, because the testimony clearly shows that statements of the business of the Denver branch were forwarded to Pittsburg from time to time, and the money which was deposited to the firm’s credit after April 24, 1890, was checked out by the firm itself, and the difference between the amount *34 of money shown' to have been received by the agency and •the amount of the checks which the firm had cashed undoubtedly disclosed the use of considerable funds by the manager of the Denver agency in the general conduct of the business. The H. J. Heinz Company are therefore chargeable with full knowledge of the course of business at this end of the route, and were advised from month to month of the fact that their cashier and bookkeeper, or general manager, whatever he may be called, was using such of the funds as he collected from the sale of goods as were essential to the management and conduct of the business. Whatever legal results flow from this apparent delegation and use of authority attach to all the transactions of the agent, and the firm at Pittsburg are undoubtedly liable to whoever dealt with the agents on the faith and strength of this apparent authority. It was shown by the testimony that the agency had been doing business with the bank for a long period of time and had frequently cashed checks without depositing them to the credit of the firm, and this fact must have come to the knowledge of the home office many months prior to the particular transactions involved in this suit. This suit took on somewhat singular aspects. The bank had apparently cashed over its counter a good many checks for Schmidtt, the agent, and had collected those checks in the usual course of business, either through the clearing house in Denver, or through the other usual 'banking channels. What gave rise to the dispute and the litigation is not made quite evident by the record. At all events, the Heinz Company gathered up some twenty-two or more checks which had been cashed by the bank over its counter on Sehmidtt’s indorsement, and brought suit against the American National Baiik to recover the amount of these checks on the ground that the indorsements were forged and unauthorized and the bank therefore liable -m for money had and received to their use for what they had collected. There is no dispute about the fact that the bank advanced the money and ultimately collected the checks. What became of that money, whether it was actu *35 ally used for the benefit of the Heinz Company, is not clearly disclosed. Presumptively it was. While it is charged in the complaint that the company did not receive the benefit of the money, there was no evidence offered which clearly proved the money had been diverted from the general use’s of the company in the payment of the expenses of the Denver house. It is true there are some statements in a couple of depositions found in the record to the effect that- the company got no benefit from those checks, but this is only a legal conclusion, and there was no legal and competent evidence which even tended "to prove the money had been diverted from the legitimate purposes and business of the agency. If necessary, we should be inclined to hold the plaintiffs bound to show the illegal diversion of the money in order to establish their cause of action. But this is wholly unnecessary, because there is enough in the history of the general course of business of the agency to charge them with knowledge of what their agents did; to clothe the agents with apparent authority to indorse the checks, cash them over the counter and use the proceeds, and therefore to bind the Heinz Company by what the agents did in the matter.
We do not feel called upon to enter into an extended or exhaustive discussion of the testimony and to bring forth all the arguments which might be deduced to support the court’s conclusion, but we deem it enough to indicate the general lines on which the judgment could be sustained, and since we find enough evidence in the record to support it, and-the court committed no error of law in the progress of the trial, we must of necessity affirm it.

Affirmed.